RECEIVED

NOV 2 1 2011

TONY R. MOORE, CLERK
BY_____
        DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

M. DIANE KOKEN

versus

PERSONNEL MANAGEMENT, INC.

CIVIL ACTION NO. 06-2277

JUDGE TOM STAGG

## MEMORANDUM RULING

Having heard the oral testimony presented and read the voluminous exhibits submitted by the parties, including the extensive briefs and depositions, the court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 and rules as follows:

## I. FINDINGS OF FACT

The findings of fact are drawn largely from the parties' stipulations. Facts additional to those stipulated have been found by the court from the testimony and exhibits received in evidence and from credibility choices common in every trial.

Plaintiff, Joel S. Ario, is the Pennsylvania Commissioner of Insurance and is the statutory liquidator of Reliance Insurance Company ("Reliance"), a company that is currently in liquidation. In October of 2001, Reliance was placed into liquidation by the Commonwealth of Pennsylvania. By operation of law, Ario was vested with

full title to all of the property, contracts and rights of action and all rights to pursue any claims or assets, in the name of Reliance.   The defendant, Personnel Management, Inc. ("PMI"), is a Louisiana corporation which operates as an employee leasing agency.  Reliance seeks recovery of what it contends are earned but unpaid premiums in the amount of $349,140.63 and $602,435.00 in unreimbursed deductibles paid on two workers' compensation policies issued to PMI.

In 1998, PMI enlisted Gary Baker ("Baker"), an insurance agent employed by Tanenbaum-Harber Co., Inc. ("Tanenbaum"), a New York insurance agency, to obtain a workers' compensation policy for its leased employees.  Baker, in turn, contacted Hartan Brokerage, Inc. ("Hartan"), a New York insurance broker, to procure the desired policy.  Ed Pray ("Pray") of Hartan secured the policy from United Pacific Insurance Company, which at the time was an affiliate of Reliance.

## A.    Policies And Premiums.

Reliance issued two policies of insurance naming PMI as the insured, the first bearing Policy Number NWA0145467-00.  This policy covered the policy period of April 1, 1998 to April 1, 1999.  The policy was renewed for a second year and covered the period of April 1, 1999 to April 1, 2000, under Policy Number NWA0145467-01.  The second policy specified a deductible in the amount of $100,000.00 per claim, but this was subject to aggregate deductible limits which

2

were based on payroll.

The annual premium estimated for the first year, based on an estimated payroll of $6,300,000.00 supplied by PMI during the negotiation of the policy, was $95,120.00, with a required cash collateral of $85,000.00. The estimated premium for the second policy year was $145,160.06, based on an estimated payroll of $12,063,199.00, that was again supplied by PMI. PMI paid those estimated premiums and the cash collateral with financing provided by Cananwill, Inc.

Both of the policies contained provisions entitling Reliance to adjust the premiums after auditing the payrolls. Reliance completed physical audits of PMI's payrolls in January of 2000 for the first policy year and in November of 2000 for the second policy year. Those audits revealed actual payrolls far larger than the estimates. The actual payroll for 1998 was $14,095,933.00, twice the estimate of $6.3 million. The actual payroll for 1999 was $31,401,208.00, nearly three times the estimate of $12 million. Reliance prepared Final Audited Premium Statements for adjusted premiums and billed PMI through Hartan for additional premiums. Hartan's files show the billings from Reliance and, in turn, Hartan's billings to PMI through Tanenbaum, PMI's agent.[1]

---

[1]Baker's letter of July 24, 2000, shows the billing for the adjusted premium for the 1998 policy year. See Plaintiff's Ex. 11. Hartan's records also contain an invoice to Tanenbaum for the second audited premium, in December of 2000. See Plaintiff's

3

Reliance sent PMI a letter dated May 9, 2003, containing a demand for payment of $524,070.00 for reimbursement of deductible losses. See Plaintiff's Ex. 5 at Reli 170. PMI disputes receiving this letter and asserts that it was sent to the incorrect address. Two year later, Reliance made a second written demand on PMI for payment of the deductibles by letter dated April 11, 2005. See Plaintiff's Ex. 4. By letter dated May 17, 2005, Reliance submitted an invoice to PMI for payment of final adjusted premiums owed for both policy years totaling $349,140.63. See Plaintiff's Ex. 5 at Reli 182. PMI, through William Byrd, its Chief Operating Officer, responded to Reliance's demand for payment in two letters, dated April 27, 2005, and June 16, 2005, and denied owing Reliance any additional money for premiums or deductible losses and denied ever purchasing a large deductible policy. See Plaintiff's Exs. 6 and 7. PMI further denied ever receiving copies of the policies, despite having paid substantial initial premiums, financed through Cananwill.[2]

**B.    Claims Adjustment.**

---

Ex. 15 at HRT-220.

[2]After Reliance filed this suit to collect the premiums and deductibles, Reliance learned in discovery that Tanenbaum could not locate any of its files pertaining to PMI's policies, and PMI destroyed nearly all records pertaining to these policies.

4

Claims were made and adjusted under the policy and losses were paid. Reliance hired Crawford & Company, Inc. ("Crawford"), a professional third party administrator, to adjust the claims under the policy.[3]  A Claims Service Agreement between Crawford and Reliance set forth the list of basic services that Crawford was to provide Reliance in the adjustment of all claims. Those basic services consisted, inter alia, of creating and maintaining files and adjusting the claims.[4]  Crawford

---

[3]Crawford was not originally the third party administrator under the policy.

[4]Crawford's Claims Service Agreement states that Crawford agrees to provide thirteen "Basic Services:"

1. To establish a file with respect to each Claim.  2. To investigate all Claims and to recommend the amount of loss reserve to be established with respect to each such Claim.  3. To provide each Claim file with a written chronology of all actions taken with respect to the underlying Claim.  4. To furnish all claim forms necessary for proper claims administration.  5. To adjust, settle or resist all Claims within the discretionary settlement authority limit of Service Co. as agreed upon by Service Co. and Insurer, in writing, from time to time (the "Authority Limit").  6. To adjust, settle or resist all Claims in excess of the Authority Limit with the express prior approval of Insurer.  7. To supervise all litigation or other proceedings involving any Claim and, where permitted, to attend any judicial or administrative hearing involving any Claim.  8. To retain and then destroy files for each Claim in accordance with the File Retention and Destruction Policy set forth in Exhibit B hereto.  9. To monitor all treatment programs recommended to a Claimant by any care provider.  10. To provide Vocational Rehabilitation and On-site Case Management services for Workers' Compensation claims, when warranted, through the vendor approved by Insurer.  11. To provide Hospital Bill Audit Services for Workers' Compensation claims, when warranted, through the vendor approved by Insurer.  12. To provide Provider Bill Audit, Utilization Review and Preferred Provider Services for Workers' Compensation claims, when warranted, through the vendor approved by Insurer.  13. To furnish to

5

maintained all of the information generated during the adjustment of claims, including detailed payment information and claims progress notes, in electronic files that were stored in Crawford's computer systems, except for hard copies of invoices, medical or legal bills, and various other medical reports or litigation documents, which Crawford routinely maintained in a paper file.

Carol Eskola ("Eskola") was the assistant vice president of data management who managed the data services department at Crawford during this time. Her deposition testimony explained the workings of Crawford's electronic file data kept on each claim. Crawford calls its computer system used for the storage of all detailed

---

Insurer and/or its designees on a monthly basis, a "Loss Run" and a "Loss Fund Activity Report." The term "Loss Run" means a computer generated listing of claims that have been posted to Service Co.'s Statistical Insurance Support Data ("SISDAT") System. The term "Loss Fund Activity Report" means a computer generated listing of accounting activity in the Loss Fund Account during the preceding month that has posted to Service Co.'s SISDAT System. Service Co. also shall furnish to Insurer and/or its designees on a quarterly basis a "Loss Cause Analysis." The "Loss Cause Analysis" means a computer generated listing of claims by cause that have been posted to Service Co.'s SISDAT System. These computer generated listings will be provided to Insurer and/or its designees in hard copy or microfiche. A maximum of five (5) copies of any single listing, either hard copy, microfiche, or any combination thereof, will be provided by Service Co. for each period. Service Co. reserves the unilateral right to amend or alter the substance and form of the listings to be provided to Insurer and/or its designees hereunder if Service Co. hereafter amends or alters the substance or form of such listings for its customers generally.

Plaintiff's Ex. 27 at Crawford 00087-00088.

payment information its "Statistical Insurance Support Data" or "SISDAT" system, which is a database program on Crawford's mainframe computers located in Atlanta, Georgia. Crawford's various field and branch office adjusters record and store all claims progress notes kept on each claim file on Crawford's Automated Risk Management System ("ARMS"), which are located or used at Crawford's various branch and field offices located throughout the United States, including those located in Metairie, Louisiana.

Crawford's routine procedure for creating and maintaining its electronic claims information begins with the creation of an electronic file in a local field or branch office based on information provided by the employer in the "First Notice of Injury" form.[5] The information related specifically to the payment of claims is transferred from the field office to Crawford's SISDAT system in Atlanta.

Under Crawford's "Claims Service Agreement," Crawford was required to transmit all claim payment data to Reliance on monthly data tapes, which were then converted to an electronic format compatible with Reliance's computer system and verified for payment. Crawford was also required to furnish to Reliance and its

---

[5]Plaintiff's exhibit 9 contains copies of 24 "First Report of Injury" forms that were signed by either Susan Maynor ("Maynor") or Jeff Smalley ("Smalley"), the Human Resource Directors during the relevant time periods. Maynor was succeeded by Smalley. Neither is currently employed by PMI. See Record Document 35, Stipulated Fact 8.

designees on a monthly basis a loss run and a loss fund activity report.  Both the loss run and the loss fund activity report are computer generated listings of claims or account transactions posted to Crawford's SISDAT system during the previous month.  Crawford's loss runs were generated on a report form denoted CM310. These monthly loss runs were generated automatically from Crawford's SISDAT system. Print copies were delivered by a third party delivery company, such as FedEx or UPS.

Reliance designated Mark Waniewski ("Waniewski"), Chief Executive Officer of PMI, as one of the recipients of Crawford's monthly loss runs.[6] Waniewski denied at trial ever receiving any loss runs from Crawford.  However, Susan Maynor, who was PMI's Human Resource Director during the first policy year, admitted that she received loss runs from Crawford, and identified the loss runs at trial.

## II. CONCLUSIONS OF LAW

### A.   Delivery Of The Policy.

Louisiana law requires the original policy be "delivered to the insured or a person entitled thereto within a reasonable period of time after its issuance." La. R.S.

---

[6] A copy of Crawford's Account Administration file, which contains Crawford's "New Program Checklist" used to create the SISDAT file system for PMI's account, was introduced as plaintiff's exhibit 27.  The list of recipients of Crawford's monthly loss run reports lists Waniewski as the PMI recipient of the loss runs.  See Plaintiff's Ex. 27 at Crawford 00024.

22:634. The Louisiana Supreme Court case of <u>Pruitt v. Great Southern Life Insurance</u>

<u>Company,</u> 12 So.2d 261 (La. 1943), clarifies this concept:

> Whether an insurance policy has or has not been delivered after its issuance so as to complete the contract and give it binding effect does not depend upon its manual delivery to or possession by, the insured, but rather upon the intention of the parties as manifested by their acts or words. The test of sufficient delivery is whether the company or its agent intentionally parts with control or dominion of the policy and places it in the control or dominion of the insured or some person acting for him with the purpose of thereby making a valid and binding contract of insurance.

<u>Id.</u> at 262.

PMI argues that Reliance never confected the policy of insurance or delivered it as required by law. The evidence before the court, however, indicates that the polices were received and transmitted to Tanenbaum for delivery. Baker, whom PMI asked to procure workers' compensation policies for it, testified that it was his custom and practice to deliver the policies. Baker further testified that he thought he had delivered the policies to PMI. Pray, of Hartan, testified that he forwarded the policies to Baker. Therefore, the court concludes that the policies were delivered to PMI, as Pray and Baker testified.

Even if the policies were not ultimately delivered to PMI, delivery was complete with delivery upon Tanenbaum, PMI's agent. See <u>McDermott Intern., Inc.</u> <u>v. Lloyds Underwriters of London</u>, 120 F.3d 583, 588 (5th Cir. 1997) (citing <u>Pruitt,</u>

12 So.2d at 264). The court finds that both Baker and Pray were agents of PMI in the negotiation of the policies at issue.[7] Baker confirmed that the policies negotiated and delivered by United Pacific were the policies that he and Pray at Hartan procured for PMI.

Furthermore, PMI paid over $500,000.00 in premiums and collateral for policies in effect for two years that it claims to have never received. There is no evidence before the court to indicate that it requested copies of the policies for its records or complained that it had not received copies of the policies. The court is unconvinced that a company would regularly pay the premiums without obtaining copies of the policies for its records. In the correspondence between PMI and Baker during the relevant time period, there is no mention that the policies were not delivered nor was there any demand that the policies be delivered.

The policy of insurance was bound on March 31, 1998, with the underwriter's acceptance given on April 3, 1998, and again on April 6, 1998, and instructions given to bind and issue the policy. See Plaintiff's Ex. 15 at HRT-079 and HRT-158. Reliance forwarded the policy to PMI's agents. Copies are in Hartan's files and

---

[7]PMI presented no evidence of a direct relationship between Hartan and Reliance that would support an inference of an agency relationship. Hartan had access to any number of insurance companies besides Reliance with which it could place coverage.

10

Baker acknowledged receiving a copy and testified he delivered a copy of the policy

to PMI. See id.[8]  The court finds that the policies of insurance were confected and

delivered as required by law.

**B.    Additional Premiums.**

The policies introduced as plaintiff's exhibits 1 and 2 constitute the contracts

between Reliance and PMI and under Louisiana law they "have the effect of law for

the parties." La. Civ. Code art. 1983.  Both policies provided that the premiums on

the declaration pages were estimates based on rates applied to PMI's estimated

payroll.  Both policies contain provisions stating that

> the final premium will be determined after this policy ends
> by using the actual, not the estimated, premium basis and
> the proper classifications and rates that lawfully apply to

---

[8]Hartan's files also contain drafts of a separate "Insurance Program Agreement." See id. at HRT 164-177. However, that document was never signed or agreed to by PMI. In fact, Pray, of Hartan, returned the insurance program agreement to Reliance, requesting alterations and updated language, which Reliance admits was never sent. There is a separate document entitled "Personnel Management Casualty Insurance Program Effective: 04/01/98 W.C. Binder NWA 014567-00," prepared by Mike McKeown of Reliance for the 1998 policy and a separate document prepared by Cynthia Artale of Reliance for the 1999 renewal policy, which were both identified by Pray as "binders" of insurance. See Plaintiff's Ex. 16 at HRT-086 and Plaintiff's Exhibit 15 at HRT-330. PMI asserts that the acts of Pray in returning the agreements to Reliance unsigned, for revision, was not "for the purpose of thereby making a valid and binding contract of insurance," but rather, repudiating that draft and requesting another. Reliance contends, and the court agrees, that the Program Agreements do not constitute part of the policies of insurance. Furthermore, PMI received a considerable benefit from the application of the terms contained within the Insurance Program Agreements.

11

> the business and work covered by this policy. If the final
> premium is more than the premium you paid to us, you
> must pay us the balance.

Plaintiff's Exs. 1 at Reli 603 and 2 at Reli 821 (Part Five, Section E). Both policies

entitled Reliance to conduct physical audits of PMI's payroll and tax records within

three years after the policies ended to determine the actual payrolls during the policy

years and calculate the final premium. See id. Part Five, Section G of the policies

states that "Information developed by audit will be used to determine final premium."

Id.

Reliance conducted timely audits as required by the policy and determined the

actual payroll records on which to apply the specified premium rates for each Code

Classification listed on the Declarations Page. The court finds that the actual payroll

for the first policy year resulted in an additional final premium of $115,909.00, and

that the actual payroll for the second policy year resulted in an additional final

premium of $233,784.55, for a total additional premium of $349,140.63. Reliance

billed PMI for these premiums in 2000 when it sent the Final Premium Adjustment

Statements to Hartan, who in turn sent invoices to Tanenbaum.

PMI acknowledged receipt of Tanenbaum's bill for the additional premium

owed on the first policy in its letter dated August 3, 2000. See Plaintiff's Exs. 11 and

12. Reliance billed Hartan for the additional premium owed on the second policy on

November 29, 2000. Hartan sent Tanenbaum the bill on or about December 7, 2000.[9]

Reliance's subsequently made a demand for payment of reimburseable deductibles

in May of 2003 and another demand for payment of additional premiums by letter of

May 17, 2005.  See Plaintiff's Exs. 3 and 5.

Both policies entitled Reliance to an adjustment of premiums following a final

audit of PMI's payrolls.  Those audits were timely conducted, and the adjusted

premiums were timely billed.  PMI has not paid and therefore owes Reliance the full

amount of $349,140.63 in additional premium amounts for both policy years.

## C.   Deductibles/Breach.

### 1.   Deductibles.

Once the policy is delivered, "Louisiana law imposes a duty on the insured to

read and know his or her insurance policy provisions."  Campbell v. Stone Ins., Inc.,

509 F.3d 665, 671 (5th Cir. 2007) (citations omitted). The policies at issue were both

"large deductible" policies, with $100,000.00 per claim deductibles.  See Record

Document 35, Stipulated Fact 4.[10] The declaration pages of both policies specify that

---

[9]There is no documentary evidence from Tanenbaum's or PMI's files concerning these billings.

[10]PMI denied at trial that the policies contained specified deductibles in the amount of $100,000.00 per claim, despite the joint stipulation of fact contained in the pretrial order which clearly stated that "[b]oth policies had deductibles in the amount of $100,000.00 per claim."  Record Document 35 at 3 (Amended Pretrial Order, Stipulated Fact 4).  However, it is well established that "a joint pretrial order signed

13

PMI was given a $100,000 large deductible credit in consideration of the $100,000 deductible, and the 1999-2000 policy contains a specific deductible endorsement referencing the $100,000 deductible per claim.[11]  The deductible endorsement that was provided in the second policy contains the following provision:

> 3. We will pay and you will reimburse us for the payments we make on your behalf for benefits under Part One - Workers' Compensation Insurance or damages under Part Two - Employer's Liability Insurance or benefits under Part Three - Other States Insurance up to the following deductible amounts:
>
> > a) $100,000 per accident for benefits or damages because of bodily injury sustained as the result of any one accident, or
> >
> > b) $100,000 per employee for benefits or damages because of bodily injury sustained as a result of disease.
>
> > > \* \* \*
>
> 4.  Option III - 100% Reimbursable in Addition to the Deductible Amount.  You will reimburse us for all benefits and damages up to the Deductible amount plus all Allocated Loss Adjustment Expenses.  Your reimbursement may exceed the Deductible Amount.

Plaintiff's Ex. 2 at 824.

---

by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." McGehee v. Certainteed Corp., 101 F.3d 1078, 1080 (5th Cir. 1996).  Thus, the court finds PMI bound by its stipulation contained within the amended pretrial order.

[11]The original policy document has no deductible endorsement, as was acknowledged at trial by Robert Bellusci of Reliance.  See Record Document 70, Trial Transcript Vol. I at 267-268.

Reliance's right to reimbursement of payments within the deductibles was subject to an aggregate limit as specified in the insurance binders, established by the aggregate rate multiplied by $100 per actual payroll.[12] Based upon the actual payrolls determined in the two physical audits conducted in 2000, Reliance's recovery of deductibles is limited under the first policy to an aggregate total of $310,111.00, using the aggregate loss rate of 2.2 per $100 of payroll. The aggregate limit for the second policy year, again based on audited payrolls at the aggregate rate of 1.92 per $100, is $612,324.00. Both limits are subject to a credit for the cash collateral that PMI paid ($85,000 and $235,000), reducing Reliance's recovery for deductible losses to a total of $602,435.00, which consists of the aggregate limits of $225,111 for the first year, combined with the aggregate limit of $377,324 for the second year.

Reliance contends that it incurred a total of $619,410.33 in deductible losses for the first policy year and a total of $1,259,669.56 in deductible losses for the second policy year. Both totals far exceed the aggregate limits for either year. Reliance timely demanded payment of these deductible losses by letter dated May 9,

---

[12]As mentioned earlier, Reliance admits that no insurance program agreement was ever signed by the parties. Reliance instead asserts that the insurance program agreement was never meant to be a part of the policy. Importantly, Reliance always considered that the Program Agreement was a part of the Insurance Program, because it contained the provisions, reflected in the binders, establishing aggregate limits. Those limits were of considerable benefits to PMI, because they limited PMI's maximum exposure for deductible losses. Reliance has always given PMI the benefit of the aggregate limits.

15

2003. See Plaintiff's Ex. 3. However, PMI asserts that it never received this letter. Reliance made a second demand for payment of the deductible losses prior to filing suit by letter dated April 11, 2005. See Plaintiff's Ex. 4.

PMI responded to Reliance's demand in a letter dated April 27, 2005, claiming that the policy contained no deductibles. See Plaintiff's Ex. 6. PMI now contends that (1) Reliance breached its obligations under the policies by failing to "communicate with the insured with respect to its claims and losses," (2) Reliance failed to "coordinate its claims loss activity with PMI," and (3) Crawford did not properly adjust the claims.

### 2.     Breach.

PMI seeks relief of its obligations to reimburse deductible losses, based on Reliance's alleged breach of its obligation to adjust the claims.[13] Louisiana Civil

---

[13]PMI's contentions of Reliance's breach depend in part upon missing claims files and its objections that the claim information retained by Reliance or by Crawford is incomplete or unreliable. PMI seeks to have this court draw adverse inferences against Reliance pursuant to the Zubulake case. See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003). Zubulake holds that once parties are on reasonable notice of litigation, each has a duty to preserve relevant evidence, including electronic information, which in that case involved deleted emails. As a remedy for the loss of evidence, an adverse inference may be drawn upon a showing that (1) the party with control of the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a "culpable" state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. See id. at 220. Crawford lost a number of the claims files, apparently due to Hurricane Katrina.

PMI testified in its deposition that it destroyed its files on the Reliance policies

16

Code article 2022 states that "[e]ither party to a commutative contract may refuse to perform his obligation if the other has failed to perform or does not offer to perform his own at the same time, if the performances are due simultaneously." As the party alleging the breach of contract for which PMI seeks relief of its payment obligations, PMI bears the burden of proof of Reliance's breach. See Rebouche v. Harvey, 805 So.2d 332 (La. App. 4th Cir. 2001).

PMI contends that Reliance was in material breach of its obligations under the policy as a result of its failure to communicate with the insured with respect to its claims and losses. Evidence of communications under the policies between PMI and either Reliance or Crawford was scant, at best.[14] PMI asserts that as a result of Reliance's failure to coordinate its claims loss activity with PMI, PMI was unable to (i) assist in the adjustment of such losses and to reduce its exposure to the losses;

as part of its document retention policy sometime in 2003, despite knowing as early as August of 2000 that a dispute existed over additional premiums and deductibles. Tanenbaum gave no explanation as to why it was unable to locate its files. The evidence in this case establishes that Crawford and Reliance both retained all of the claim date information on their computers in electronic form and furnished PMI with copies of that data during discovery. The only documents not produced were the hard copy claim files stored in Metairie, Louisiana, that were destroyed in Hurricane Katrina, and those in Arkansas that PMI declined to search.

This court is satisfied that the files lost in Hurricane Katrina were destroyed without any culpable state of mind and through no fault of Crawford. As to those hard copy claims files, this court will not draw any adverse inference against Reliance for the failure to preserve or produce them.

[14]The policies were administered during the twenty-four to thirty-six months prior to Reliance going into formal liquidation.

17

(ii) pass through the cost of these adjustments to its customers, and (iii) avoid the imposition of additional hidden costs in the renewal of the policy. PMI contends that as an entity engaged in the professional employment leasing business, it is particularly well-suited to assist third party administrators in connection with the adjustment and reduction of exposure for workers' compensation claims, and, in any event, is able to "pass through" such costs to its client only when the insurer timely notifies it of such losses and the status thereof. PMI asserts that Reliance was unable to or unwilling to comply with the obligations which it advertised as being available to its insureds.

The Casualty Insurance Program documents of both policies contained a "Section V, Service Program" which provides a list of Reliance services "applicable to all programs" including "loss control and engineering," "loss exposure analysis," "loss control program evaluation," "training programs," and "claims handling." See Plaintiff's Ex. 15 at HRT 86-118, 98-102 and 101-102. In the section regarding claims handling, Reliance states it "organized [its] Claims Department to supervise and supplement the services of Third Party Administrators (TPAs)." Id. at HRT-101. Reliance further states that it believes this approach provides its clients with "the flexibility to select the most responsive and cost effective TPA while being assured of consistently high quality claims management services." Id. Reliance further

18

claims that a Claims Account Manager ("CAM")[15] is

> assigned to the client as the focal point for claims management matters. The CAM is responsible for designing the service program with the client and broker including - claim handling, medical management, bill review, fraud investigation and related services. On an ongoing basis, the CAM reviews coverage questions and supervises the client's TPA. We work closely with the TPA in identifying the most significant cases and seeking to minimize the costs and consequences of these losses. Besides providing an extra level of supervision, we also take an active role in coordinating defense counsel, pursuing structured settlements and arranging rehabilitation in the proper instances.

Id. at HRT-101-102.   The document also provides that Reliance will conduct periodic audits of the TPA and

> will examine the practices employed on the account to determine whether the client's instructions are followed or whether there are any areas for improvement beyond those determined in normal day-to-day interaction. This audit will be conducted by experienced independent claims consultants assigned by Reliance National. The results are reviewed with the client, the broker and the TPA.

Id. at HRT-102.  Further, Reliance promises to conduct "corporate operational reviews of TPAs" to "determine whether the procedures employed provide accurate and timely accounting and data entry of claims."  Id.  These documents close with stating "[t]he costs of the services described above are included in our fee quotation." In the final sentence, Reliance states: "We will work with the client to arrange a system where claims costs are paid directly by the client to the TPA, simplifying the

---

[15]Cynthia Tutoli was the CAM for PMI.

19

process and eliminating the need for any secondary escrow of funds." Id.

None of the foregoing occurred, as acknowledged by both the claims account manager, Tutoli, and Hudson, a supervisor at Crawford. See Deposition of Tutoli at 61-64 and Deposition of Hudson Vol. I at 86-93. The testimony of Hudson and Tutoli support PMI's assertion that Reliance failed to supervise PMI's claims as promised in the Casualty Insurance Program for each policy year. For example, when Tutoli was asked whether she was aware of Reliance supervising the claims adjustment activities of Crawford on the PMI account, she responded: "Unless there was an issue that developed, I would not be in normal contact for what their procedures are in overseeing their services." Deposition of Tutoli at 61. When Tutoli was asked whether any supervisory services were provided by Reliance on the PMI account, she answered: "I would have no knowledge of that." Id. Tutoli was further questioned as follows:

> Q:    Are you aware of any services provided by Mr. Rinner or anyone else on behalf of Reliance dealing with claims handling for PMI?
>
> A:    Not that I would know.
>
> Q:    Are you aware of anybody at Reliance providing services involving medical management for PMI?
>
> A:    Not that I would know.
>
> Q:    Are you aware of anybody at Reliance providing services for bill review

20

on the PMI account?

A:     Not that I would know.

Q:     Are you aware of any fraud investigation undertaken by Reliance on the PMI account?

A:     Not that I would know.

Q:     Are you aware of any efforts by Reliance to review coverage questions on the PMI account?

A:     Not that I would know.

Q:     Are you aware of any operational reviews provided by Reliance on the PMI account?

A:     Not that I would know.

Q:     Are you aware of any audits of any sort provided by Reliance on the PMI account?

A:     Reliance would have audits, file audits, I do not know, or do not recall, if any PMI files were included in any of their audits.

Id. at 62-63.  Hudson also testified in a similar vein:

Q:     Do you know the name of the Reliance claims account manager or managers who served for the PMI account?

A:     No.

Q:     Do you have any knowledge of Crawford having communicated with any claims account manager for Reliance?

A:     No, sir.

21

Q:   Do you have any knowledge of Reliance having designed any sort of service program for PMI?

A:   No, sir.

Q:   Do you have any knowledge of Reliance having designed a claims handling program for PMI?

A:   If there is a client instruction, yes.   But that would be my only knowledge are client instructions.

Q:   Do you have any knowledge of Reliance having constructed some sort of medical management program for PMI?

A:   No, sir.

Q:   Do you have any knowledge of Reliance having performed any sort of bill review services for PMI?

A:   No, sir.

Q:   Do you have any knowledge of Reliance having performed any fraud investigation for PMI?

A:   No, sir.

. . .

Q:   What sort of supervision, if any, did Reliance perform over the claims adjustment services for PMI?

A:   I don't know.

Q:   Did Reliance take any action to your knowledge, to identify the most significant cases that Crawford was handling for PMI?

A:   No, sir, not that I know of.

Q:   Did Reliance do anything to work with Crawford to minimize PMI's cost on these files?

A:   I don't know.

Q:   Did Reliance perform any services with Crawford in coordinating defense counsel?

A:   I don't know.

Deposition of Hudson, Vol. I at 86-89.  These numerous failures illustrate that Reliance breached its contractual obligations to PMI.

Reliance contends that there is no basis to conclude that it breached any obligation to communicate with PMI or to coordinate its loss adjustment with PMI. First, Reliance asserts that there is no provision in the policies that obligated it or Crawford to communicate with PMI or consult with PMI during the adjustment of the losses.  However, the Casualty Insurance Program indicates otherwise, as detailed above.  Reliance further contends that Crawford's only obligation was to furnish Reliance or its "designees" with monthly "Loss Runs" on Crawford's Report Form CM310.  While it is true that the trial testimony from Eskola and Tutoli of Crawford and Maynor of PMI illustrates that Crawford sent the loss runs as required, Reliance, neglects to mention that Crawford was also obligated to furnish Reliance or its "designees" with a monthly **loss fund** report and that Reliance unilaterally altered this requirement without any notice to PMI.

23

Reliance made two significant, unilateral changes to the policy. Without notice to PMI, Reliance changed the third party administrator from Sterling to Crawford. More significantly, Reliance fundamentally altered the program so that Reliance funded all losses, instead of a monthly billing of losses submitted to PMI. While Reliance gave notice of these changes to Crawford so that the SISDAT system would change billing information, there was no notice of this change to PMI. As a result of this change, PMI, rather than receiving monthly bills for losses after the exhausting of the initial $85,000 collateral, received its first bill for losses on April 11, 2005, more than five years after the expiration of the second policy period. The court agrees with PMI that had Reliance not departed from the original agreement, PMI would have known upon receiving its first monthly billing of the losses which were being incurred on its account. This, too, was a breach of the agreement.

Yet another crucial breach occurred when Crawford assumed responsibility as the third party administrator. As the new third party administrator of the accounts, the first action which was to occur was an initial "set up meeting" between Crawford, Reliance and PMI to establish methods and procedures necessary for the effective and efficient communication and administration relating to claims of injured employees. Don Jones ("Jones") of Reliance testified as to his belief that a one page written document represented notes from an initial set up meeting whereby a threshold

24

reporting amount of $25,000 and various other guidelines were established. Jones, however, acknowledged that he had no personal knowledge about these matters. Maynor, Byrd and Waniewski of PMI all testified that they believed no such meeting took place. Tutoli, the account manager from Crawford for PMI's account, was responsible for this set up and acknowledged that she did not have any communication with PMI to set up the account. Hudson, the claim supervisor at the Crawford New Orleans office, had no knowledge of such a set up meeting and believes she would have attended if it took place.

On the basis of the information contained in the setup meeting, Crawford was to set up a "Client Instruction Sheet," which provides instructions to Crawford's adjusters on all of the required communications, reporting thresholds, addresses, means of transmission of communications, and other information to facilitate easy communication between Crawford and PMI. The instruction sheet sets up the entire claims management system for reporting, communicating and adjusting the claim between the client and Crawford. Following the second deposition of Vicki Hudson, taken post-trial, Crawford acknowledged that it had never set up the PMI account in its client instruction sheet system. As a result, no reporting system to PMI was ever set up and none was ever initiated and followed. As Hudson testified, the client instruction sheet for PMI never existed and as late as March of 2000 (the last month

25

of the second policy term), internal communications at Crawford reveal that adjusters are seeking information on how to communicate with the client, PMI.[16]

Although PMI was aware of each claim that was being submitted to Crawford during the claim period since it initiated each new claim,[17] it had no idea how the investigation, mitigation and settlement of any of its claims were progressing, inasmuch as neither Crawford nor Reliance had set up a system to implement the essential communications between the employer and the claims adjuster. As a result of the failure to submit monthly bills to PMI (a result of Reliance's unilateral change of the insurance program agreement in late April of 1998 without notice to PMI),

---

[16]The person charged with supervising the adjusters on behalf of Crawford is requesting information on the name of the PMI contact person, their address and proper means of communication.

Furthermore, when adjusters did attempt to send formal initial reports, status reports, medical information or other communications to PMI, the adjuster instead addressed those pieces of correspondence to "PMI c/o" and then utilized an address of a person within Crawford itself or at Reliance because of the absence of contact information within the Crawford SISDAT system. This was because the client instruction sheet had never been inputted into the Crawford system. Due to this failure, both Waniewski and Byrd both believed in early 1999 that there had been very few losses against the $85,000 collateral. It also explains why Waniewski sought to negotiate more favorable terms, on the basis of what he believed to be a highly favorable loss history.

[17]Under the system as contemplated by the policy documents, not only would PMI receive acknowledgments and status reports on every significant claim, Waniewski (not Susan Maynor) would receive (1) a monthly bill for losses and (2) a monthly loss run. He testified that he received neither. Tutoli testified that there should have been twenty-four separate transmittal letters to Waniewski of these reports. See Deposition of Tutoli at 56.

PMI had no knowledge of the amount of losses and claims paid until it received its first bill, almost five years later, for $524,070.

Reliance has not adequately rebutted the allegations of inadequate communication and improper adjustment of claims. The improper adjustment of the claims is but one piece of this very complicated puzzle. Reliance failed in its duty to communicate with its client, PMI, through all of its actions. This failure to communicate was not rebutted by Reliance and all of the evidence before the court indicates that there was a serious failure of communication between Reliance (either through Crawford or independently) and PMI. In addition, the court has failed to find any authority for Reliance to have unilaterally altered the requirements of the contract to change the third party administrator and, more importantly, to discontinue sending the monthly loss fund reports. PMI is correct in its assertion that the receipt of this report was crucial in its evaluation of losses under the policy. Based on all of these actions, or lack thereof, the court concludes that Reliance breached its obligations under the policy to properly adjust the claims as a result of its failure to communicate. Reliance, therefore, is not entitled to recover any of the $602,435.00 in deductible losses which it seeks.

## III. CONCLUSION

Based on the foregoing, Reliance is entitled to recovery of $349,140.63 in

additional premiums on the policies that were issued. The court further concludes that PMI proved that Reliance breached its obligations to properly adjust the claims. Therefore, the court concludes that Reliance is not entitled to recover any of the $602,435.00 amount for deductible losses.

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana, this 21st day of November, 2011.

_____
JUDGE TOM STAGG

28